ANDREW WHITE  12/15/2020

Page 1

1                   IN THE UNITED STATES DISTRICT COURT
                    FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3     ANDREW WHITE,                )
                                   )
4                    Plaintiff,    )
                                   )
5     V.                           )
                                   )  Case No. 3:19-cv-03181-SEM-TSH
6                                  )
      JOSEPH FELCHNER and        . )
7     ELLEN SWEENEY,               )
                                   )
8                    Defendants.   )

9

10

              DISCOVERY DEPOSITION OF ANDREW WHITE
11               Taken on behalf of Defendants

12

              The deposition of ANDREW WHITE, a
13    witness called at the instance of the Defendants,
      for purposes of DISCOVERY taken on December 15,
14    2020, at 10:30 a.m., at the Office of the
      Attorney General, 3000 Montvale Drive, in the
15    City of Springfield, State of Illinois, before
      Erikia Schuster, Illinois Certified Shorthand
16    Reporter No. 084-004660, pursuant to notice.

17

18

19

20

21

22

23

24

25

EXHIBIT

_____C_____

ANDREW WHITE  12/15/2020

Page 2

```
 1           I N D E X   O F   E X A M I N A T I O N

 2

 3                                                   Page
      Questions by Ms. Fruth..................... 4, 52
 4    Questions by Mr. Pierce.................... 41

 5

 6              I N D E X   O F   E X H I B I T S

 7    Number              Description            Page

 8
      1               Mr. White's Documents       50
 9

10    (Original exhibit attached to original transcript.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2

 3           MS. SHANNON FRUTH
             Assistant Attorney General
 4           500 South Second Street
             Springfield, IL  62701
 5           (217) 782-9014
             Sfruth@atg.state.il.us
 6
                  On Behalf of the Defendant
 7                Sweeney.

 8

             MR. CHARLES A. PIERCE
 9           Pierce Law Firm, PC
             3 Executive Woods Court, Suite 200
10           Belleville, IL  62226
             Cpierce@piercelawpc.com
11
                  On Behalf of the Defendant
12                Felchner.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ANDREW WHITE 12/15/2020

1       IT IS HEREBY STIPULATED AND AGREED, that the

2    deposition of ANDREW WHITE may be taken in shorthand

3    by Erikia Schuster, a Certified Shorthand Reporter,

4    and afterwards transcribed into typewriting.

5

6                      * * * * *

7                   ANDREW WHITE,

8    of lawful age, being produced, sworn and examined on

9    behalf of the Plaintiff deposes and says:

10                  DIRECT EXAMINATION

11   BY MS. FRUTH:

12       Q.    Can you please state your name for

13   the record and spell it for the court reporter?

14       A.    Andrew White, Andrew, A-n-d-r-e-w,

15   White, W-h-i-t-e.

16       Q.    Mr. White, my name is Shannon Fruth,

17   and I am an attorney representing Ellen Sweeney

18   in this matter.  You are here today because we

19   requested your deposition in connection with a

20   civil lawsuit you filed.  My colleague here,

21   Chuck Pierce, represents Joseph Felchner, and he

22   may have some questions for you as well.

23             The purpose of this deposition is for

24   us to find out what personal knowledge you have

25   about the aspects of this case.  Have you ever

ANDREW WHITE 12/15/2020

1   been deposed before?

2        A.   No.

3        Q.   I would like to just go over some

4   basic ground rules that will help make the

5   process go smoothly.  The purpose of this

6   deposition is for you to provide truthful answers

7   to the questions I ask.  All though the setting

8   today is informal, I remind you that you are

9   under oath and your testimony has the same force

10  and effect as if you were testifying in court.

11  Do you understand that?

12       A.   Yes.

13       Q.   The court reporter is taking down all

14  of my questions and your answers.  The court

15  reporter will prepare a transcript of what is

16  said here, a copy of which will be available to

17  you.  Do you understand that?

18       A.   Yes.

19       Q.   You must answer all of your questions

20  verbally, yes or no, not uh-uh or huh-uh.  The

21  court reporter also cannot take down nods, shrugs

22  or hand gestures or any other nonverbal

23  responses, okay?

24       A.   Okay.

25       Q.   The court reporter can only take down

```
 1   what one person is saying at a time.  Please wait
 2   until I finish my question before you begin
 3   answering.  I, in turn, will wait for you to
 4   complete your answer before asking my next
 5   question, okay?
 6        A.   Okay.
 7        Q.   If you do not understand a question
 8   that I ask, please ask me to repeat or rephrase
 9   the question.  I will do my best to make my
10   questions understandable, okay?
11        A.   Okay.
12        Q.   If during the deposition you recall
13   information that you did not provide in response
14   to an earlier question or recognize that you may
15   not have given a full or accurate answer, just
16   say so.  This way we can be sure that the record
17   is complete, okay?
18        A.   Yes.
19        Q.   I will give you the opportunity to
20   take a break from time to time.  So just let me
21   know if you need to take a minute or a few
22   minutes to take a break, but you must answer the
23   question that is pending before you before we can
24   take a break, okay?
25        A.   Okay.
```

ANDREW WHITE 12/15/2020

```
 1          Q.   Okay.  Do you have any questions
 2     concerning these instructions or about the
 3     deposition itself?
 4          A.   No, not at this time.
 5          Q.   Thank you.  Did you meet or talk with
 6     anyone about your deposition here today?
 7          A.   No.
 8          Q.   And did you review any documents or
 9     do anything else to prepare?
10          A.   Yes, I did.
11          Q.   Okay.  Let's just start.  If you can
12     explain your relationship with Christine Loftin,
13     please?
14          A.   Crystal Loftin was my ex.  We dated
15     for a year and a half.  Prior to that, we have
16     been knowing each other for at least, what,
17     15 years and that was pretty much -- we pretty
18     much know each other.
19          Q.   When did your romantic relationship
20     end?
21          A.   It ended probably in I want to say
22     the end of '18.
23          Q.   So the end of 2018?
24          A.   Yes.
25          Q.   So that would be around November or
```

ANDREW WHITE  12/15/2020

1    December of 2018?

2         A.   No.  It's -- it was between June, the

3    latest.

4         Q.   Okay.  So the end of the relationship

5    was June of 2018?

6         A.   Yes.

7         Q.   And were you living with Ms. Loftin?

8         A.   Yes, we were staying together.

9         Q.   Did you move out at the end of your

10   relationship or when did you move out of her

11   home?

12        A.   Well, I can't recall it.  It was

13   between June and July of '18.  That's when she

14   became violent around my kids.  That's the reason

15   why I left.

16        Q.   You said you left the relationship

17   because she was becoming violent?

18        A.   Yes, around my kids.  So I had no

19   other choice but to leave.

20        Q.   And you had young children at the

21   time?

22        A.   Yes.

23        Q.   Did you feel that she was a danger to

24   your children?

25        A.   Yes.

ANDREW WHITE 12/15/2020

```
 1          Q.    When did Ms. Loftin purchase the 1995
 2    Mercury Marquis?
 3          A.    I don't remember.  I don't.
 4          Q.    Was it before your relationship
 5    ended?
 6          A.    Yes.
 7          Q.    So it would have been before June of
 8    2018?
 9          A.    Yes, ma'am.
10          Q.    Do you know who Ms. Loftin purchased
11    the vehicle from?
12          A.    Yeah.  It was a guy in Chatham,
13    Illinois.
14          Q.    So it was not from a dealership?
15          A.    No.
16          Q.    But rather from an individual who was
17    selling the vehicle?
18          A.    Correct.
19          Q.    Do you know why she purchased the
20    vehicle?
21          A.    The vehicle was purchased original
22    because she had the other, which is the Dodge,
23    that was the family car and the Grand Marquis, we
24    had discussed the matter with that because I was
25    going back and forth to my job in various towns
```

```
 1    in the Grand Marquis.  So it was actually -- it
 2    was actually agreeing on me getting the car,
 3    which we did, and she ended up switching it over
 4    into my name, you know, and that's the reason why
 5    it was purchased.  I gave her a thousand dollars.
 6    She paid 1,500 for it.  I gave her the $1,000
 7    that I would take for the car because I was
 8    servicing it and all of that.
 9          Q.    Did Ms. Loftin say anything regarding
10    the vehicle being used by her daughter?
11          A.    No.  Denyia (phonetic) never drove
12    that car.  She was driving the other car, the
13    family car.
14          Q.    So at that time she was driving the
15    family vehicle?
16          A.    Yes, both of them were.  I was the
17    only one driving the Grand Marquis.
18          Q.    Okay.  So you just said now that Ms.
19    Loftin's daughter was using the family vehicle,
20    the Dodge?
21          A.    Correct.
22          Q.    Was Ms. Loftin's daughter getting
23    ready to leave for college at that time?
24          A.    No.  She was going to college, to
25    Lincoln Land.
```

ANDREW WHITE 12/15/2020

1          Q.    So was there a vehicle that she could

2    use to get around for school?  Would that have

3    been the Dodge or would that have been some other

4    vehicle?

5          A.    That was the Dodge.

6          Q.    To get around school, she would use

7    the family car and not the Grand Marquis?

8          A.    I've never seen Denyia drive the

9    Grand Marquis.

10          Q.    Okay.  Do you know approximately when

11    Ms. Loftin would have submitted an application

12    for title for the Grand Marquis?

13          A.    No, I don't.  I don't even remember.

14          Q.    And I believe you said earlier that

15    you don't recall when she purchased the Marquis?

16          A.    Correct.

17          Q.    Would it have been in 2018, though?

18          A.    Yeah, it was in 2018.

19          Q.    Okay.  When Ms. Loftin initially

20    purchased the vehicle, was your name on the

21    title?

22          A.    No, it wasn't.

23          Q.    So initially, it was Ms. Loftin's

24    name that was only on the title when she

25    purchased the vehicle?

ANDREW WHITE  12/15/2020

1      A.   Correct.

2      Q.   **And how did you come to acquire the**

3  **grand Marquis?**

4      A.   Well, she agreed to putting it in my

5  name because it wasn't none of them driving this

6  Grand Marquis but me.  She just bought the car at

7  first and then I ended up just giving her the

8  thousand dollars because I started working, and I

9  don't -- you guys don't ever drive the car.  I'm

10  driving the car back and forth.  That was my

11  transportation back and forth, and she agreed,

12  so --

13      Q.   **Yes.  Did you get a receipt when you**

14  **gave her the thousand dollars to purchase the**

15  **vehicle?**

16      A.   No, I never got the receipt.  I

17  wasn't thinking about a receipt.  We were in a

18  relationship, and I didn't even think about a

19  receipt.

20      Q.   **So you just gave her a thousand**

21  **dollars --**

22      A.   Yes.

23      Q.   **-- because the car was in her name?**

24      A.   Correct.

25      Q.   **And you wanted to continue to use the**

ANDREW WHITE 12/15/2020

```
 1    vehicle?
 2         A.   Right.  She agreed.  I mean, I didn't
 3    see no big of a deal because, I mean, the car was
 4    switched in my name.  She agreed to it and all
 5    this stuff extra stuff she come up with, I didn't
 6    have no slightest idea what she done.  All I know
 7    is some stuff took place and I had to remove
 8    myself from the house because of the kids.
 9         Q.   So at the time --- I'm sorry.
10    Scratch that.  When did you give her the thousand
11    dollars for the vehicle about?
12         A.   It was before father's day.  And at
13    that time, I did not switch the title until I
14    believe the 10th of July because I hadn't gotten
15    my first check yet.
16         Q.   Okay.  So then the title was switched
17    to your name around the 10th of July?
18         A.   Correct.
19         Q.   Even though you had given the money
20    for the vehicle earlier than that date?
21         A.   It was around the 10th.  I believe --
22    was it the 10th?  It was around the 10th and then
23    the 13th I had went and switched it over.  It was
24    the Friday or something that I got paid.
25         Q.   Okay.  So you gave Ms. Loftin the
```

```
 1    thousand dollars around the 10th of July?
 2         A.   Correct.
 3         Q.   And then did you complete the
 4    application for the vehicle around the 13th of
 5    July?
 6         A.   It was the 13th.
 7         Q.   Okay.  So that would have been the
 8    title for the vehicle that you applied to get?
 9         A.   Correct.
10         Q.   Because at that time the title was
11    only in Ms. Loftin's name?
12         A.   Correct.
13         Q.   Before July 10th, which was around
14    the time that you gave Ms. Loftin the thousand
15    dollars for the vehicle, did you only have keys
16    to that vehicle or did other household members
17    have keys to the vehicle?
18         A.   I had the keys to the vehicle.  I'm
19    the only one that had the keys to the vehicle.
20         Q.   Were there more -- was there more
21    than one key or there was just only one key for
22    the vehicle?
23         A.   One key that I know of, yeah.
24         Q.   Okay.  And at that time even before
25    July 10th or July 13th, the date you registered
```

ANDREW WHITE 12/15/2020

1   the title for the vehicle, you were the only

2   person that had the key to the vehicle?

3         A.    Correct.

4         Q.    Okay.  Do you know why Ms. Loftin

5   wanted to give you the vehicle or you purchased

6   the vehicle, but --

7         A.    I mean, they wasn't driving the car.

8   I was the only one driving it.  It was pretty

9   much a back and forth to work thing with the car.

10  I never drove the Dodge, but, what, a few times

11  and she said, well, we don't drive the Grand

12  Marquis.  You can just start driving the car back

13  and forth because I just started my job out there

14  and I didn't have no transportation at the time.

15  It was when my vehicle was broke down and so it

16  was just, man, you can just get the Grand

17  Marquis.  She was going to give it to me.  I

18  said, no, I'll give you a thousand bucks for it

19  instead because I was looking at the car.  I had

20  kids, too.  They had to get back and forth from

21  appointments to appointments and stuff like that,

22  and I was looking at it from that angle, and she

23  agreed.

24        Q.    Do you know how long Ms. Loftin had

25  title of the vehicle before this transaction

1    occurred?

2        A.    Not --

3        Q.    Would it have been less than six

4    months?

5        A.    Pretty much.  I don't remember.

6        Q.    If I told you that Ms. Loftin

7    purchased the vehicle on June 5th, does that

8    sound -- June 5th, 2018, does that sound -- does

9    that sound accurate with your recalling of the

10   timeline of events?

11       A.    Probably.  I really don't remember.

12       Q.    All you know is that you gave Ms.

13   Loftin the thousand dollars around July 10th?

14       A.    Correct.

15       Q.    So she possibly would have had the

16   vehicle for -- or title to the vehicle for less

17   than a month before you gave her the thousand

18   dollars for the vehicle?

19       A.    Correct.

20       Q.    Do you remember calling the police on

21   July 19th regarding removal of the property?

22       A.    Yes.

23       Q.    Can you explain what happened that

24   day?

25       A.    Well, at the time we were outside

ANDREW WHITE  12/15/2020

```
 1    arguing and the whole thing was Christy got to
 2    arguing about me not staying there at certain
 3    times and stuff like that, and she picked to
 4    arguing in front of the kids and started slamming
 5    stuff and throwing things.  And I ended up
 6    saying, well, me and the kids are fixing to leave
 7    for a couple of days.  It wasn't no move out
 8    thing at the time.  We are going to leave for a
 9    couple of days, go out to moms until you calm
10    down.
11              So what made me call the police is
12    she threatened -- she said, well, you can't leave
13    with the car, you know.  You leave with the car,
14    I'm calling the police.  I said, well, the car is
15    in my name.  You know what I'm saying?  The car
16    is in my name.  Why not?  She said no, no, trying
17    to say -- what did she say?  She was going to
18    stab the tires, bust the windows and she was
19    doing this all in front of the kids, and I had
20    called the police and told them what was going
21    on, I needed them to stand by while I get my
22    property.  And they asked, they said, well, are
23    you in the vehicle?  I said yes, I described my
24    vehicle and I told them my dad was on the way
25    with a U-Haul.
```

ANDREW WHITE 12/15/2020

1      Q.    And then did the police arrive on the
2   scene?
3      A.    Yes, they did.
4      Q.    Can you explain what happened when
5   the police arrived?
6      A.    They stood by and waited until I got
7   my car free and stuff like that.  I loaded up in
8   the U-Haul, left in the U-Haul.  I told Tracey I
9   would be back to get the car later on.  She said
10   she was going to work.  Okay.  And we ended up
11   staying out at my dad's house for a while, had
12   dinner and stuff like that, and I come back later
13   that night and got the car, the same night.
14      Q.    So after the altercation, this
15   occurred at Ms. Loftin's home, correct?
16      A.    Yes.
17      Q.    You went to go pick up the car you
18   said?
19      A.    While she was at work, yes.
20      Q.    When she was at work.  Did Ms. Loftin
21   sign the transfer of title application when you
22   submitted it on July 13th, around there?
23      A.    She was the one that gave me the
24   title, yes.
25      Q.    And did you live with Ms. Loftin up

```
 1    until July 19th, 2018?

 2         A.   Correct.

 3         Q.   And then it was that day that you

 4    moved out of the residence?

 5         A.   Was it the 19th that I moved out?  I

 6    don't remember what exact date I moved out.  As

 7    far as initially broken up with Christy, it

 8    wasn't straight up.  I just moved out.  We were

 9    still talking and stuff like that.  Initially

10    just break up, I think like about a month or so

11    after the fact that all of this happened, we had

12    broken up.  I just said --

13         Q.   So it was just a fight really on

14    July 19th --

15         A.   Yeah, right.

16         Q.   -- that led to an altercation where

17    the police were called?

18         A.   Correct.

19         Q.   Had you had any contact with the

20    police regarding this relationship before

21    July 19th, 2018?

22         A.   No, because I didn't want -- I mean,

23    she had a good job.  You know, I didn't want to

24    mess her job up that she's been having for

25    sometime, and I was on the verge of trying to
```

ANDREW WHITE 12/15/2020

```
 1    keep my job at the same time.  And when the kids
 2    got involved -- at the same time, I had custody
 3    of both -- still do -- have custody of both of my
 4    kids so I didn't want to put that in jeopardy
 5    because I really didn't have nowhere to go as far
 6    as going somewhere stable with my kids other than
 7    with my mom and my dad so I didn't want to get
 8    anybody in trouble.  I just told her, look, just
 9    calm down and, you know, act right.  We'll come
10    back, you know.  I just can't have that in front
11    of the kids.  It scared the kids.
12         Q.    Were those children Ms. Loftin's
13    children?
14         A.    No.
15         Q.    But they were -- how old were those
16    two children?
17         A.    At the time, my daughter was like --
18    I want to say four or five months.  My son was --
19    I don't know.  He was older.  I think -- I want
20    to say he was like 18 months, I think, 18,
21    19 months.
22         Q.    Is Azonia (phonetic) Ms. Loftin's
23    daughter?
24         A.    That's her daughter.
25         Q.    And do you remember where she was
```

ANDREW WHITE  12/15/2020

1     when the police arrived that day?

2          A.   When I called the police?

3          Q.   Yes.

4          A.   She was downstairs with us.  We were

5     all down there in the basement.

6          Q.   Do you know at what point it was

7     reported to the police that the car was taken,

8     the Grand Marquis?

9          A.   No, I didn't have no slightest idea

10    until when I was pulled over.

11         Q.   Do you know of any reason why Ms.

12    Loftin would report the vehicle as stolen?

13         A.   Because we was into it.  We were

14    fighting and that's the only thing that I could

15    come up with.  She done it out of anger and I

16    told her, I said, well, I'm not coming back until

17    stuff changes, and she started her mess like

18    usual so I didn't answer her calls and it

19    happened.

20         Q.   When you submitted the application

21    for transfer of title to the vehicle around

22    July 13th, were you ever issued the registration

23    for the vehicle by the Secretary of State?

24         A.   Yeah.

25         Q.   When did you receive the

ANDREW WHITE  12/15/2020

1   registration?

2        A.   The registration was received on the

3   same time I went and paid my money to get it

4   switched over.

5        Q.   **So that would have been July 13th**

6   **that you received the registration for the**

7   **vehicle?**

8        A.   Yeah, I've got copies of it right

9   here.

10       Q.   **Okay.  You don't have to show me that**

11   **for now.  I'm just trying to establish the facts.**

12   **Did you have any conversations with Christine**

13   **Loftin between about August 3rd and August 10th?**

14       A.   August 3rd and August 10th?

15       Q.   **2018.**

16       A.   I wouldn't answer the phone for her

17   because she kept talking out of her head, you

18   know, it wasn't her so I wouldn't answer the

19   phone.

20       Q.   **So you just refused to answer the**

21   **call?**

22       A.   Yeah.  I didn't want to put up with

23   that.  It was just too much.

24       Q.   **Because August 10th, 2018, was the**

25   **day that you were arrested, correct?**

ANDREW WHITE 12/15/2020

```
 1          A.    Correct.
 2          Q.    So you didn't speak with Ms. Loftin
 3   between August 3rd and August 10th that you can
 4   recall?
 5          A.    Right.  I know my brother did.  My
 6   brother was still staying there.  My oldest
 7   brother.
 8          Q.    So your brother was still staying
 9   with Ms. Loftin between this time period?
10          A.    Yep.
11          Q.    Did your brother indicate to you that
12   there was something going on with Ms. Loftin
13   regarding this vehicle?
14          A.    Nope.  He said he didn't know
15   anything about it because he was back and forth
16   to work himself.
17          Q.    So Ms. Loftin didn't have any
18   conversations with him regarding her concerns
19   that the vehicle was taken from her?
20          A.    No.
21          Q.    Have you ever spoken with
22   Investigator Ellen Sweeney?
23          A.    Over the phone, I have.
24          Q.    Do you know when the first time you
25   would have spoken with Investigator Sweeney?
```

ANDREW WHITE 12/15/2020

```
 1          A.    I believe it was on the third of --
 2          Q.    So it would have been August 3rd,
 3    2018?
 4          A.    August 3rd.
 5          Q.    Do you remember what happened during
 6    that conversation?
 7          A.    The whole conversation identified
 8    that I was Andrew on the phone.  All she wanted
 9    to know is where is the vehicle at, and I told
10    her, well, the vehicle is where it's supposed to
11    be, with me, and that's when she indicated that
12    Christy had went down there and filed for a lost
13    and stolen title.  And I responded, no, I
14    never -- she ain't told me anything like that,
15    and she said, well, I need to know where the
16    vehicle is at.  I said, the vehicle is with me.
17    The vehicle is my car, you know.  Why would she
18    do that?  And it was just back and forth.  I need
19    to know where the vehicle is, where the vehicle
20    at.  And then she asked me where I was.  I said
21    I'm in Chatham over at my mom's house, and she
22    asked if I could meet her down at Chatham Police
23    Station, and I told her, no, for what reason?
24    There's no reason to meet nowhere.
25                So I called my friend Jason Sloman --
```

```
1    he's a Springfield police officer -- and told him
2    what was going on and he looked into it.  He
3    called me back.  He said, hey, he said this is
4    what is going on.  He said she wants you to go
5    down there because she's going to arrest you
6    right off of the top, you know.  Don't go down
7    there, you know.  And he also said was there a
8    court date issued for the car?  He said because
9    the car is in your name is exactly what he said.
10   He ran my plates and everything.  The car is in
11   your name and there's no reason to meet nobody.
12          Q.    What is your relationship with
13   Mr. Sloman?
14          A.    Sloman, I done work with Mr. Sloman
15   and also other officers there at the station with
16   drug stings and stuff like that, helping the
17   community and stuff like that.  I worked with him
18   for over a year, and that's the only relationship
19   we have together.
20          Q.    So you would help with ongoing
21   investigations?
22          A.    Yes.
23          Q.    And after -- on August 3rd, 2018,
24   after your initial conversation with Ms. Sweeney
25   you then called Mr. Sloman?
```

ANDREW WHITE 12/15/2020

```
 1          A.    Yes.
 2          Q.    To see if he had any advice for the
 3   situation?
 4          A.    Correct.
 5          Q.    At that time when you were speaking
 6   with Ms. Sweeney, did she tell you that you could
 7   come to prove ownership of the vehicle?
 8          A.    I don't remember.  I don't recall
 9   that.  All that was said was Christy had shown
10   ownership, if I could go down there and show
11   ownership.  I remember telling her, well, I don't
12   have a title or anything right now.  I just
13   switched the registration.  She said, well, I put
14   a hold on your title.  That's what she told me.
15   There's a hold on your title until you come down
16   and talk to me is exactly what she said.
17          Q.    Didn't earlier you say you had
18   received registration from the Secretary of
19   State?
20          A.    I got registration.  I didn't receive
21   the title.  She held my title.  I didn't received
22   my title.
23          Q.    So you were issued the registration
24   for the vehicle, but you never received a title
25   for the vehicle?
```

ANDREW WHITE 12/15/2020

```
 1          A.    Correct.
 2          Q.    Okay.  So did you have the
 3   registration with you in the vehicle -- you know
 4   how come people keep the registration in the
 5   vehicle?
 6          A.    Yeah.  It was in the vehicle.
 7          Q.    So you were keeping the registration
 8   of the vehicle in the car with you, but you had
 9   not yet received the title --
10          A.    Correct.
11          Q.    -- to demonstrate that you owned the
12   vehicle?
13          A.    Correct.
14          Q.    In your initial conversation with
15   Investigator Sweeney on August 3rd, did -- before
16   you spoke with Mr. Sloman, did you agree to meet
17   with Investigator Sweeney?
18          A.    Yes, I did until I was told not to.
19          Q.    So then how did Ms. Sweeney come to
20   know that you were no longer willing to meet with
21   her?
22          A.    I don't know.  I never got back with
23   her at all.
24          Q.    Did you call her back on August 3rd?
25          A.    No, I did not.
```

ANDREW WHITE 12/15/2020

1      Q.    So you just decided not to meet with
2  her?
3      A.    Correct.
4      Q.    Was the reason that you chose not to
5  meet with her related to the information that Mr.
6  Sloman told you?
7      A.    At the time, like I said, I had kids,
8  okay, I'm the only one caring for my kids.  And
9  as far as meeting with somebody that want to
10  arrest me and stuff like that, without knowing
11  the truth, I wasn't going to take a chance of
12  getting arrested knowing that I'm the only one
13  out there for my kids so, no, I did not meet Ms.
14  Sweeney.
15      Q.    So Mr. Sloman had told you at that
16  time that you had an active warrant, correct?
17      A.    He didn't say that.  He just said
18  that there's no need to meet with her.  The car
19  is in your name.  What is going on?
20      Q.    When did you learn that there was an
21  active warrant then?
22      A.    I'm not sure.  I'm not sure at all.
23  I'm not sure.  And to be honest, I don't think
24  there was a warrant out for my arrest at the
25  time.  It was just told don't go meet Sweeney

ANDREW WHITE 12/15/2020

```
 1    because this is what is going on because I didn't
 2    have to -- you don't have to meet anybody to talk
 3    to nobody so I didn't.
 4         Q.    Did Investigator Sweeney tell you at
 5    a certain point that if you did not prove that
 6    you owned the vehicle that the vehicle would be
 7    entered into the system as stolen?
 8         A.    I don't recall that.  I don't recall
 9    that at all.
10         Q.    Did Investigator Sweeney tell you why
11    she believed the vehicle was stolen?
12         A.    No.  I know in her reports it says
13    different.  It says that by her being in her
14    business for so long so knows the person's
15    identity and signatures and stuff like that which
16    is something for a judge to make that decision
17    upon when it comes to signatures and stuff like
18    that.  That's not her job title.  I'm innocent
19    until I'm found guilty, and that's that.
20         Q.    Did Investigator Sweeney tell you
21    that Ms. Loftin thought that you took the title
22    out of Ms. Loftin's mailbox?
23         A.    She didn't tell me anything like
24    that.
25         Q.    Did you ever speak with Investigator
```

ANDREW WHITE 12/15/2020

1    Sweeney after August 3rd?

2         A.   I don't recall, no.

3         Q.   So you do not remember speaking with

4    Investigator Sweeney on August 6th?

5         A.   I don't recall it.  Not at all.

6         Q.   Do you remember about when the

7    warrant was quashed for your arrest?

8         A.   No.

9         Q.   Do you remember ever using

10   inappropriate language or yelling at Investigator

11   Sweeney?

12        A.   I don't remember.  I don't remember

13   no using inappropriate.  I got kind of loud with

14   her, yeah, because I was already fired up with

15   what Christy done did and here she go calling and

16   asking me about the car and all this, yeah, I got

17   loud a little bit with her.

18        Q.   Would that have been on August 3rd,

19   2018?

20        A.   I don't remember.  It's been a couple

21   of years.

22        Q.   So you don't remember speaking with

23   Investigator Sweeney on August 6th, 2018?

24        A.   No.  I know there was a couple of

25   calls that I did not answer and then she left a

ANDREW WHITE 12/15/2020

1  voicemail.  I remember she was leaving a

2  voicemail and I didn't return her call.

3      Q.    So after your call on August 3rd,

4  2018, Investigator Sweeney attempted to try to

5  reach you again?

6      A.    Yeah.

7      Q.    And she left you a voice message?

8      A.    I believe so.

9      Q.    Do you remember what the voice

10 message said?

11     A.    Well, it didn't really say anything.

12 She thought she hung up and it was her and her

13 fellow workers talking about the situation, about

14 me and it was some stuff that was said that she

15 didn't know that she hadn't hung up.  She didn't

16 hang up.

17     Q.    So you received the contents of that

18 conversation in a message?

19     A.    Correct.

20     Q.    When did you receive notice of

21 revocation of title for the vehicle?

22     A.    It was -- it looked like she put it

23 in on the 16th of August, and it was mailed out

24 to me on the 20th of August after the fact the

25 car was taken.

ANDREW WHITE  12/15/2020

1          Q.    So you received revocation for the
2     title of vehicle on August 16th, 2018?
3          A.    No, she put it into the system.
4          Q.    She put it into the system and then
5     you didn't receive it until August 20th?
6          A.    Yeah, she mailed it off August 20th.
7          Q.    Did you receive it in your possession
8     on August 20th or was it mailed on August 20th,
9     2018?
10         A.    It was mailed out on August 20th.
11         Q.    So when did you receive it, if it was
12    mailed on August 20th?
13         A.    Do you mind me looking at this paper?
14         Q.    Yes.  You can refresh your
15    recollection.
16         A.    Okay.  So I got to look at the actual
17    thing in my phone.
18         Q.    It's okay if you don't recall.
19         A.    No.  It's just she certified that on
20    the 20th that she sent all and stuff like that.
21    It had to be like the end of August or something
22    that I had actually got it in the mail.
23         Q.    So you would have received that at
24    the end of August of 2018?
25         A.    Yes.

ANDREW WHITE 12/15/2020

```
1          Q.   Okay.  At the time that you were
2    arrested by Officer Felchner, did Office Felchner
3    mention speaking with Investigator Sweeney?
4          A.   At the time when he pulled me over,
5    it was told to me, he said, Mr. White, I'm
6    pulling you over because your plates come back
7    suspended and revoked, and I explained to him, I
8    said it couldn't be because I just switched the
9    title over into my name.  And he said, well, I
10   can't let you drive off in the car and then he
11   seen my kids in the back.  He said is there any
12   way you can have someone to come get you and the
13   kids because I have to tow the car.  I can't have
14   you driving off because your plates are suspended
15   and revoked.  I kept telling him no, it couldn't
16   be so.
17             I went to reach to show him my
18   registration and stuff like that.  He didn't want
19   to see it at all.  He did not want to see it.  He
20   glanced at it, but he didn't want to see it.  He
21   asked me to step out of the car.  I said, well, I
22   was on the way to Taylorville to get my phone
23   because I left my phone at the friend's house in
24   Taylorville.  I said there's no way I can call
25   anybody.  He let me use his phone to call my dad
```

```
 1   off his phone.  That's how my dad come up here.
 2   My dad came and got the kids.
 3              By the time my dad come, the sheriff
 4   pulled up and told him you need to put him in
 5   handcuffs, the car is stolen, all of a sudden.
 6   The car was stolen.  Now, if the car is stolen,
 7   that's something he should have told me when he
 8   first pulled me over.  The car wasn't ever
 9   stolen.  The car wasn't never -- my plates was
10   never revoked or suspended at the time.  It was
11   just something Sweeney was ordering people to do.
12        Q.   Do you know if Investigator Sweeney
13   put into the system that the vehicle was stolen?
14   How would an officer know that the vehicle was
15   stolen?
16        A.   How would they know?
17        Q.   Yeah.
18        A.   Well, easily.  The car wasn't ever
19   stolen because if it was stolen, Felchner would
20   have told me it was stolen.  He said the plates
21   was revoked and suspended.  It became stolen when
22   the sheriff pulled up and said it was stolen.
23   And then when we got out into the county, the
24   county couldn't -- they couldn't verify the
25   stolen car or anything, none of that.  They was
```

ANDREW WHITE 12/15/2020

```
 1    talking to me.  They said there's no way that the
 2    car was stolen at all.  It's just like they put
 3    it into the computer and then turned around.  By
 4    the time I got to the county, it was taken out.
 5    It was taken out of the computer.
 6         Q.   But earlier didn't you say that Ms.
 7    Loftin had reported that the vehicle was stolen?
 8         A.   Correct.  I mean, she can report it
 9    stolen all day.  But the bottom line is, I mean,
10    the officers of the law they know better, for
11    one, you know.  If that's chaos in the computer
12    they see -- and I know this from experience.  I
13    have family that is officers of the law, you know
14    what I'm saying.  To be truthful, it was a civil
15    matter -- and for one, it was a civil matter
16    because the car was already in my name as
17    registration.  And if they knew their job
18    description, they would have looked there in the
19    computer to see that.  It was just some under the
20    table stuff going on, period.
21         Q.   I don't know if you answered my
22    original question, which was do you remember
23    Officer Felchner saying that he spoke with
24    Investigator Sweeney about this at the time that
25    you were arrested?
```

ANDREW WHITE 12/15/2020

```
 1          A.   No.   No.   All he said that the car --
 2    he started talking about Felchner (sic) when the
 3    sheriff pulled up.  Okay.  Let's get her on the
 4    phone, you know, and I don't know what she told
 5    them and I don't know what was the conversation,
 6    but all of a sudden I'm getting arrested for a
 7    stolen vehicle and been issued other minor
 8    citation tickets and stuff like that.  I failed
 9    to surrender a title and my registration and
10    stuff like that, which was a lie.  He never asked
11    me to surrender anything.
12          Q.   Do you remember speaking with
13    Investigator Sweeney on August 10th, the day you
14    were arrested?
15          A.   No, I never spoke with Sweeney.  In
16    fact, she said she didn't even want to talk to
17    me.
18          Q.   Are you familiar with the policies
19    and practices of the Secretary of State as a
20    whole?
21          A.   No, I'm not.
22          Q.   Are you trained in signature
23    matching?
24          A.   No, I'm not.
25          Q.   Can you tell me how you believe
```

ANDREW WHITE 12/15/2020

1   **Investigator Sweeney engaged in deceptive**

2   **practices?**

3          A.    Well, I believe she went over her job

4   description by ordering and I say dictating

5   illegal procedure, having other officers engage

6   into her wrongful act.

7          Q.    You also alleged that Investigator

8   **Sweeney defamed your character.  Can you explain**

9   **why that is?**

10         A.    Because she immediately pretty much

11  said, yeah, you stole the car -- you stole the

12  title out of the mailbox and signed the title and

13  all this and that.  And plus, my name was -- I

14  was all in Rochester police, the police beat and

15  there was a lot of people that seen the report

16  and like my job, the roofing job, he let me go

17  because of that.

18         Q.    **Because you got arrested?**

19         A.    Yeah.  He seen it all in the

20  Rochester Beat.  Churches I went to, they was

21  looking down on me.  It kind of messed me up for

22  a while like as far as getting a job and stuff

23  like that.  I had to go -- I had to wait and get

24  my stuff expunged myself in order for me to go

25  get an actual good job.  I had to get that stuff

ANDREW WHITE 12/15/2020

```
 1   off of my background.  And yes, it put a big
 2   weight on me for a while.
 3          Q.   Had you ever been arrested before
 4   August 10th, 2018?
 5          A.   Years ago.  That's when, you know, I
 6   was out doing wrong and stuff like that and I
 7   changed, but, yeah, years ago, yes, I've been in
 8   prison and stuff like that.
 9          Q.   About what year was the time that you
10   were arrested?
11          A.   When I went to prison?
12          Q.   Uh-huh.
13          A.   I went to prison three different
14   times.  1996, 2006 and 2012.
15          Q.   And were you convicted of a crime in
16   1996?
17          A.   1996, I had copped out to that crime
18   because I, you know, I was involved in it, you
19   know.  I ain't going to lie about anything.  I
20   mean, if I was involved, I was involved.  So I
21   copped out to six years.  That's when I was a
22   minor.  2006, the same thing.  I had took time
23   because I was in the room.
24          Q.   And what were you convicted of in
25   2006?
```

ANDREW WHITE  12/15/2020

Page 39

```
 1          A.    2006, robbery.

 2          Q.    And in 2012?

 3          A.    2012, it was a domestic dispute.

 4          Q.    Was a weapon involved in 2012?

 5          A.    Nope.  It was just an argument.

 6          Q.    And how long were you put in prison

 7    in 2012?  Did you go to prison?

 8          A.    One year.

 9          Q.    One year?

10          A.    One year.

11          Q.    So in total, it looks like you have

12    been in prison for six years in 1996?

13          A.    Yeah, I did two and a half years off

14    of the six years.

15          Q.    Two and a half years?

16          A.    Yeah.  18 months off of four years in

17    2006.

18          Q.    Okay.  So even though you were

19    sentenced for a longer term, you got out of

20    custody earlier?

21          A.    Yeah.

22          Q.    Do you know when you requested

23    documents from the Secretary of State from -- for

24    a Freedom of Information request?

25          A.    It was after I got released from the
```

ANDREW WHITE 12/15/2020

```
 1    county.  I don't remember.
 2          Q.   Why did you do so?
 3          A.   Because, for one, I was looking for
 4    the car.  I was looking for the car because my
 5    dad -- my dad stated that the sheriff that told
 6    Felchner to arrest me, told -- my dad said that
 7    he didn't see anything and he didn't see nobody
 8    drive off and stuff like that, so I pretty much
 9    it -- I pretty much was thinking, you know, the
10    car is back over at Christy's immediately, you
11    know.  And I called down to Rochester Police
12    Department, and I said where is the car and stuff
13    like that, and all they told me was Ellen Sweeney
14    had told Felchner to take my plates off of the
15    car and get the registration and stuff like that
16    out the -- my originals out of the car, and she
17    had picked them up there at the station.
18          Q.   So the purpose of the Freedom of
19    Information Act was to try to locate the vehicle?
20          A.   That and file a suit, yes.
21          Q.   Okay.  And sorry if this is
22    repetitive, but in 1996, what were you convicted
23    of?  I apologize?
24          A.   It was armed robbery.
25          Q.   Armed robbery.  I don't think that
```

ANDREW WHITE  12/15/2020

```
 1    was clear.  So in total you had three
 2    convictions; armed robbery, robbery and then a
 3    domestic dispute?
 4         A.    Correct.
 5              MS. FRUTH:  Okay.  Thank you.  I
 6    don't have any more questions right now.
 7    CROSS-EXAMINATION BY MR. PIERCE:
 8         Q.    Mr. White, I have a few.  My name
 9    again is Chuck Pierce.  I represent Officer
10    Felchner in this case.  I'm not going to go back
11    through everything that the other counsel has
12    asked you.  I just want to fill in a few blanks,
13    okay?  So there will be -- I'm going to skip
14    around a little bit and I'm not trying to trick
15    you.  I'm just trying to fill in a couple blanks
16    here.
17              So if I understand correctly, you had
18    worked as a confidential informant for Office
19    Sloman at sometime in the past; is that correct?
20         A.    Correct.
21         Q.    And did he pay you for your work?
22         A.    He didn't pay me, no.
23         Q.    Somebody did?
24         A.    Yeah.
25         Q.    Was he with the county or was he with
```

ANDREW WHITE  12/15/2020

1   the city?

2          A.   City.

3          Q.   Any time you helped him with one of

4   these drug busts or buys or snitched on somebody

5   you got paid?

6          A.   Yes.

7          Q.   Okay.  Did he ever get charges

8   dropped for you when you snitched?

9          A.   No.

10          Q.   How long had you been snitching for

11   Sloman?

12          A.   A little over a year.

13          Q.   So I'm trying to understand the

14   timeframe here, the timeline I should say, excuse

15   me.  July 19th is when you were trying to get

16   your stuff back and you left Christy's house

17   permanently, if you will, taking the car with

18   you?  Does that sound like the right date?

19          A.   Yes.

20          Q.   And sometime after that you got a

21   call from Investigator Sweeney and she was

22   telling you that there was a problem with the

23   title?

24          A.   With the car.

25          Q.   With the car.  Okay.  And she told

ANDREW WHITE 12/15/2020

1    you that Christy had reported it stolen?

2         A.   Yes.

3         Q.   Okay.  And she said, hey, come meet

4    with me to see if we can sort this out and you at

5    first agreed but then you said, no, I'm not going

6    to do it?

7         A.   Right.

8         Q.   And one of reasons you said you

9    weren't going to do it is because you called

10   Sloman and had him check into it?

11        A.   Yes.

12        Q.   And Sloman told you don't go, you'll

13   get arrested?

14        A.   Yes.

15        Q.   He told you that there's a warrant

16   out for you?

17        A.   He didn't tell me that.  He didn't

18   say there was a warrant out for me.  He said you

19   don't have to go nowhere.

20        Q.   He told you if you went down there,

21   Investigator Sweeney was going to arrest you?

22        A.   Yeah.  That's exactly what he said.

23        Q.   Okay.  Because he had looked

24   something up and knew that there was something in

25   the system showing that you had a stolen car?

ANDREW WHITE  12/15/2020

```
 1          A.    I don't know why he said it.  He just
 2   said you don't have to go down there at all.
 3          Q.    And so when you got pulled over in
 4   Rochester by Officer Felchner, let me stop there
 5   for a minute.  Did you know Officer Felchner
 6   before that date?
 7          A.    No.
 8          Q.    Never dealt with him before?
 9          A.    No.
10          Q.    As far as you know, he didn't know
11   who you were?
12          A.    No.  I don't think so.
13          Q.    He didn't know Christy Loftin?
14          A.    No.
15          Q.    Have you ever dealt with Felchner
16   since that date?
17          A.    No.
18          Q.    So he's just out there and happens to
19   see you drive by?
20          A.    Yes.
21          Q.    And he pulled you over, correct?  You
22   have to answer out loud, sir.
23          A.    Yes.
24          Q.    And he told you that it was in his
25   system that there was I think you said that the
```

ANDREW WHITE 12/15/2020

1    plates were revoked and the registration was --

2        A.    Was suspended.

3        Q.    So he told you that there was

4    something in the system showing that you weren't

5    supposed to be driving this car with these

6    plates, right?

7        A.    Correct.

8        Q.    And did you ever get -- strike that.

9    Did you ever hear Investigator Sweeney get on the

10   radio and explain the situation to you that same

11   day?

12       A.    Nope.

13       Q.    Okay.  From what you've told me,

14   Felchner was going to just let you go with a

15   ticket until the county deputy showed up and

16   said, hey, this guy has got a stolen car, you've

17   got to cuff him and arrest him?

18       A.    Yes.

19       Q.    So the county deputy believed that

20   you were driving a stolen car as far as you

21   understand?

22       A.    Yeah.  Because he has been talking to

23   Sweeney is what I found out.  He had Sweeney on

24   the phone.

25       Q.    So the deputy had Sweeney on the

ANDREW WHITE  12/15/2020

Page 46

1    phone?

2         A.   Yes.

3         Q.   Felchner didn't have Sweeney on the

4    phone?

5         A.   No.

6         Q.   What was the deputy's name?

7         A.   I don't remember.

8         Q.   All right.  And I think you said your

9    dad -- that Felchner let you use his phone to

10   call your dad so you could make arrangements for

11   your kids?

12        A.   For me and my kids because I wasn't

13   under arrest at all.

14        Q.   At this point it was just to come

15   pick you and your kids up?

16        A.   Yeah.  He was going to tow the car.

17   That's what Felchner was on until the sheriff

18   pulled up.

19        Q.   And what is your dad's name?

20        A.   Clifton White.

21        Q.   Does he live here in the area?

22        A.   He stay in Chatham.

23        Q.   What address is he at?

24        A.   He's at 812 Deerfield Road.

25        Q.   Okay.  Now, you said that as a result

ANDREW WHITE 12/15/2020

1    of this arrest you got fired from your roofing

2    job?

3            A.    Yeah.

4            Q.    Where had you been working?

5            A.    Midwest American Roofing.

6            Q.    Where are they located?

7            A.    Well, he run his business -- it's a

8    big garage out there on 16th Street.

9            Q.    Is that in Springfield?

10           A.    Yes.

11           Q.    Because before that you had been

12   working at JBS out in Beardstown?

13           A.    JBS, I got fired from there.

14           Q.    And you got fired about a week or two

15   before this arrest?

16           A.    No.  I got fired because I was still

17   on probation and I was coming in late and stuff

18   like that and -- my shift was -- I couldn't

19   handle that shift.

20           Q.    When did you get fired from JBS?

21           A.    I don't remember, but they gave me

22   three times and three times you're late you're

23   gone.

24           Q.    Did you ever lie to Investigator

25   Sweeney and tell her you were still working at

ANDREW WHITE 12/15/2020

1    JBS?

2         A.   No, I didn't.

3         Q.   Do you know why she put that in her

4    report?

5         A.   No.

6         Q.   Did you tell her you had been working

7    at JBS?

8         A.   Yes.

9         Q.   The convictions that we've talked

10   about, the three that you mentioned, were those

11   all in Sangamon County?

12        A.   The 2012 was in Menard County when I

13   was living there.

14        Q.   Do you have any convictions in any

15   counties other than Sangamon or Menard?

16        A.   No.

17        Q.   Any arrests in any county other than

18   Sangamon or Menard?

19        A.   No, I pretty much got everything that

20   is on my record besides the 2006, I'm still

21   working on that because the Covid 19, it slowed a

22   lot of stuff down.  Everything is expunged off of

23   my record.

24        Q.   Is that something that the police

25   have helped you do because you were a snitch?

```
 1          A.    No.  I done that myself.
 2          Q.    And just so I'm clear, you said you
 3    do have some documents.  You were looking to try
 4    to find out dates.  What documents do you have
 5    that you brought with you here today?
 6          A.    I have my insurance -- do you want to
 7    see them?  I've got the documents with the
 8    Rochester, my tax form.
 9          Q.    Let's slow down here so I can see.
10          A.    That is the police beat right there.
11          Q.    Can so the first -- I tell you what.
12    Do we have the ability to make copies of all of
13    this, Shannon?  And we can just copy and attach
14    it?
15          MS. FRUTH:  Yes.
16          MR. PIERCE:  Why don't we just take a
17    break and we will get copies then and it will be
18    easier and then I can just read through it on my
19    time.
20          A.    What I was going to do, I was going
21    to attach it with the courts anyway.
22          Q.    While we're here, I'd like to get it
23    all and have her staff run it through the copier
24    here.  So why don't we go off of the record and
25    we'll do that, okay?
```

ANDREW WHITE  12/15/2020

```
 1          A.    Okay.
 2                (Recess taken.)
 3          Q.    Sir, while we took a break, you were
 4    kind enough to let us make some copies of some of
 5    the documents in your folder here.  And I just
 6    want to make sure that I understand what you
 7    provided here.  I've marked them as Defendant's
 8    Group Exhibit No. 1 and we'll attach them to the
 9    deposition.  The first page, that is a printout,
10    you said, of the Chatham police beat, that's the
11    newspaper, I believe?
12          A.    The Rochester.
13          Q.    Rochester, excuse me.  And it
14    mentions where you got arrested.  Okay.  The
15    second page, that looks like it's the Department
16    of Revenue form.  It just says private party
17    vehicle use tax transaction.  Is that where you
18    were transferring the vehicle from Christy to
19    yourself?
20          A.    Yes.
21          Q.    When you did that, did you go to the
22    Secretary of State's office or did you go to one
23    of those title companies?
24          A.    The Secretary of State.
25          Q.    The next page is an insurance card.
```

ANDREW WHITE 12/15/2020

1  You got that issued in your name on July 20th,

2  2018; is that correct?

3        A.   Correct.

4        Q.   The next page is the order of

5  revocation.  That's something that the Secretary

6  of State produced to you in this case?

7        A.   Correct.

8        Q.   And the next thing is also a title

9  and/or registration revocation request.  Another

10  document that the Secretary of State produced to

11  you in this case?

12        A.   Yes.

13        Q.   Were there any other documents in

14  your folder, separate from these, that were

15  related to this lawsuit?

16        A.   No.

17        Q.   And what documents was it that you

18  said you showed to Officer Felchner that night?

19        A.   It was the registration.

20        Q.   Well, none of these were a

21  registration.

22        A.   Let me see.  I gave you the wrong

23  ones.  I'm sorry.  Here is this one.

24        Q.   We'll make an extra copy of that then

25  and that is a 2019 Illinois registration card

1   with your name and your Deerfield Road address

2   and that's what you said you had in your car with

3   you and you showed to Officer Felchner?

4           A.    Correct.

5           Q.    So you said he did glance at that

6   that night; is that correct?

7           A.    Yes, he did.

8           Q.    And he said it didn't matter, it's in

9   the system and I've got to do what I've got to

10  do?

11          A.    Correct.

12          MR. PIERCE:  That's all the questions

13  I have for you, sir.  Thank you.

14          MS. FRUTH:  I just have one

15  follow-up.

16  REDIRECT EXAMINATION BY MS. FRUTH:

17          Q.    Earlier you had mentioned that it was

18  the deputy that had spoken with Ellen Sweeney; is

19  that correct?

20          A.    Both of them eventually spoke with

21  them because the deputy pulled Felchner to the

22  side and was talking to him, and what I seen with

23  my own eyes, they went in the back of the squad

24  car that I was in and he told the -- the deputy

25  told Felchner to take the speaker off of him.  He

ANDREW WHITE 12/15/2020

Page 53

```
 1   took the speaker off of him.  He took the speaker
 2   off of him and put it right on the back of the
 3   truck and they stepped away from the truck and
 4   they started talking.  After that, they come to
 5   the passenger side, which is Felchner's squad
 6   car, and pulled down the window.  Felchner pulled
 7   down the window and the deputy was talking, hey,
 8   we've got Sweeney on the phone, you know, and
 9   they both was talking right there with Sweeney,
10   and they asked me did I want to talk to her.  I
11   said no, and she said -- she told them just go
12   with ahead and arrest him, and that was that.
13           MS. FRUTH:  I don't have any more
14   questions.
15           MR. PIERCE:  No more questions.  Do
16   you want to explain signature or you want me to
17   do it?
18           MS. FRUTH:  You can explain it.
19           MR. PIERCE:  Sir, we're done with the
20   deposition now and what is going to happen is the
21   court reporter is going to go back and type it up
22   into a little booklet form.  Not going to do it
23   today, but sometime in the near future she'll
24   type it up and it will say question and answer
25   and question and answer.  As a witness, you have
```

ANDREW WHITE 12/15/2020

```
 1    a right to read through that to make sure that
 2    she heard you and understood you correctly.  You
 3    don't get to go back and change a yes to a no or
 4    anything like that, but you can make sure that
 5    she heard you.  Or you can just rely on her to do
 6    her job professionally.  These ladies are very
 7    well trained in this and they're very good at it,
 8    and you can just say I know she did a good job,
 9    and I don't want to have to bother reading it and
10    just waive your signature.  It's your choice.  I
11    can't tell you what to do.  Ms. Fruth can't tell
12    you what to do because we are not your lawyers.
13    I can tell you 99 percent of the people just say
14    I'll waive signature and not mess with it, but
15    it's something that you've got to decide and let
16    us know today.  Which would you like to do it?
17              THE WITNESS:  I'd like to sign my
18    signature.  I'd like to go through it.
19              (The deposition was concluded at
20    11:27 a.m.)
21
22
23
24
25
```

ANDREW WHITE  12/15/2020

```
 1              CERTIFICATE OF REPORTER

 2

 3       I, ERIKIA SCHUSTER, a Certified Shorthand

 4   Reporter (IL), Missouri Notary No. 09561566, do

 5   hereby certify that the witness whose testimony

 6   appears in the foregoing deposition was duly sworn by

 7   me, that the testimony of said witness was taken by

 8   me to the best of my ability and thereafter reduced

 9   to typewriting under by direction; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken, and further that I am not a relative or

13   employee of any attorney or counsel employed by the

14   parties thereto, nor financially or otherwise

15   interested in the outcome of the action.

16

17

18

19

20   _____

21   Certified Court Reporter

22

23

24

25
```